**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF FLORIDA**
**GAINESVILLE DIVISION**

SEA TURTLE CONSERVANCY; CENTER FOR
BIOLOGICAL DIVERSITY; DEFENDERS OF
WILDLIFE; GULF RESTORATION NETWORK,
INC.; AND TURTLE ISLAND RESTORATION
NETWORK,

      Plaintiffs,

v.                          Case No. 1: 09-CV-259-SPM-GRJ

GARY LOCKE, United States Secretary of
Commerce; ERIC SCHWAAB, Assistant
Administrator for Fisheries; and the NATIONAL
MARINE FISHERIES SERVICE,

      Defendants.
_____/

## Order on Motions for Summary Judgment

        THIS CAUSE comes before the Court upon Plaintiffs' Motion for Summary

Judgment (doc. 68), with attached Memorandum in Support (doc. 68-1),

Statement of Material Facts (doc. 68-2), Declaration of Stephen E. Roady (doc.

68-3) and Exhibits (doc. 68-4 through 68-16); Defendants' Response to Plaintiffs'

Statement of Material Facts (doc. 79); Defendants' Cross-Motion for Summary

Judgment (doc. 76), with attached Memorandum in Support (doc. 77), and

1

Statement of Material Facts (doc. 78); Plaintiffs' Response to Defendants' Cross-Motion for Summary Judgment (doc. 84); and Plaintiffs' Response to Defendants' Statement of Material Facts (doc. 85). For the reasons stated below, this Court will GRANT in part Plaintiffs' Motion for Summary Judgment.

## I. FACTUAL BACKGROUND

This dispute revolves around the plight of the loggerhead sea turtle and Defendants' actions regarding the Reef Fish Fishery (Fishery). In 1984, the Gulf of Mexico Fishery Management Council (Council) issued the Gulf Reef Fish Fishery Management Plan (FMP) pursuant to its authority under the Magnuson-Stevens Fishery Conservation and Management Act (MSA). The FMP was the governing authority over the Fishery and authorized both commercial and recreational vessels to fish, mainly targeting grouper and snapper, in the Gulf of Mexico. The Fishery operates primarily in the continental shelf waters off the coast of western Florida. Although the target catch of the Fishery is a variety of reef fish species, the Fishery also captures and kills non-target species (known as bycatch), including the loggerhead sea turtle. The loggerhead sea turtle has been listed as a threatened species pursuant to the Endangered Species Act (ESA) since July 28, 1978.

2

Because of the Fishery's interactions with a threatened or endangered species, namely the loggerhead sea turtle, and pursuant to Section 7(a)(2) of the ESA, Defendants conducted an intra-agency consultation concerning its authorization and operation of the Fishery under the current FMP.  Pursuant to this consultation, Defendants issued a Biological Opinion in February of 2005 (2005 BiOp) assessing the Fishery's impact on sea turtles.  The 2005 BiOp concluded that the continued operation of the Fishery was not likely to jeopardize the continued existence of any sea turtle species.  This "no jeopardy" decision also included an Incidental Take Statement (ITS) which predicted the amount of sea turtles that would be killed as a result of bycatch from the operation of the Fishery.

In September of 2008, Defendants revealed data indicating that the Fishery had exceeded the number of incidental takes the 2005 BiOp ITS had predicted.  As a result, and pursuant to Section 7(a)(2) of the ESA, Defendants reinitiated consultation of the Fishery and its impact on the sea turtle. Defendants also began the process for developing a long-term amendment (Amendment 31) to the FMP pursuant to the National Environmental Policy Act (NEPA) and the MSA.  In January of 2009, while final action was pending on Amendment 31, the Council requested promulgation of an emergency rule to reduce incidental take of sea turtles pursuant to the Defendants' authority under

the MSA.  <u>See</u> 16 U.S.C. § 1855(c)(1).  In April of 2009, this emergency rule was

passed and temporarily closed the Fishery to all fishing shoreward of the 50

fathom depth contour in the Gulf of Mexico.  This emergency rule had an

expiration date of October 28, 2009.

Understanding that this emergency rule would expire, Defendants

developed an interim rule, pursuant to its authority under the ESA, that would

remain in effect until finalization of Amendment 31.  On October 16, 2009 and

prior to the expiration of the emergency rule, Defendants promulgated this new

interim rule (the ESA Rule) governing the operation of the Fishery.  Although the

ESA Rule did not have a specified expiration date, the Defendants stated in the

preamble to the ESA Rule that it would be in place until Defendants could pass

Amendment 31.  On March 29, 2010, Defendants signed the Record of Decision

(ROD) documenting Defendants' final approval of Amendment 31, the Final

Environmental Impact Statement (FEIS), and the implementing regulations for

Amendment 31.  On April 26, 2010, Amendment 31 and the implementing

regulations were published.  On May 26, 2010, Amendment 31 and these

implementing regulations became effective.

Concurrently, and as part of the decision to reinitiate consultation after the

2005 BiOp ITS had been exceeded, Defendants created a new biological opinion

(2009 BiOp).  On October 13, 2009, the 2009 BiOp was completed.  The 2009

BiOp assessed the Fishery's impact on ESA-listed species, including the loggerhead sea turtle, under the ESA Rule (in effect October 16, 2009), Amendment 31, and the regulations in effect prior to the emergency rule.  It is the validity of this 2009 BiOp, the passage of Amendment 31, which relied on this 2009 BiOp, and the continued operation of the Fishery, especially in light of the April 20, 2010, Deepwater Horizon oil spill, which Plaintiffs ask the Court to review pursuant to the Administrative Procedure Act (APA) and challenge as unlawful under the ESA, NEPA and the MSA.

## II. LEGAL STANDARD

### A. Standard of Review on Motion for Summary Judgment

Both parties submit motions for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure, Local Rules 7.1 and 56.1(A) and the Parties' Joint Status Report (doc. 59).  According to Fed. R. Civ. P. 56(a), "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Because this case comes before the Court pursuant to the judicial review standards of the APA, the material facts are those facts present in the agency's administrative record.  The function of this Court in an administrative proceeding "is to determine whether or not as a matter of law the evidence in the administrative record permitted the agency to make the decision it did."

Occidental Eng'g Co. v. Immigration and Naturalization Serv., 753 F.2d 766, 769 (9th Cir. 1985).

### B. Scope of Judicial Review

Pursuant to the APA, final agency actions taken under the ESA or NEPA are subject to judicial review.  See 5 U.S.C. §§ 704, 706.  Therefore, the 2009 BiOp (AR Doc. 197)[1], the regulations implementing Amendment 31 (AR Doc. 230 at 8074-82), the approval of Amendment 31 (AR Doc. 230 at 8137-55) and the approval of the FEIS (AR Doc. 232) are final agency actions subject to judicial review pursuant to the APA.  The continued operation and ongoing authorization of the Fishery is reviewable pursuant to 16 U.S.C. § 1540(g).

Under the APA, the reviewing court is required to "hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law . . . ." 5 U.S.C. § 706(2)(A).  "The arbitrary and capricious standard is exceedingly deferential."  Miccosukee Tribe of Indians of Fla. v. United States, 566 F.3d 1257, 1264 (11th Cir. 2009) (internal citations omitted).  The scope of this judicial review of the administrative agency's action is generally limited to the agency's administrative record.  5 U.S.C. § 706; Preserve Endangered Areas of Cobb's History, Inc. ("PEACH") v. U.S. Army Corps of Eng'rs, 87 F.3d 1242, 1246-47

---

[1] Citations to the Administrative Record for Defendants' Record of Decision for Amendment 31 (dated July 1, 2010) will be to: AR Doc. # at page

(11th Cir. 1996).  A reviewing court's conclusion that an agency action is arbitrary or capricious requires the court to find that the agency had "no rational basis for the decision."  Tackitt v. Prudential Ins. Co., 758 F.2d 1572, 1575 (11th Cir. 1985).  If an agency "fails to examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made," then the agency action "must be reversed as arbitrary and capricious . . . ."  Sierra Club v. Martin, 168 F.3d 1, 5 (11th Cir. 1999) (internal citations omitted).  However, once the court finds that "a rational connection between the evidence and the decision" exists, then the court "must defer to the agency's expertise."  Tackitt, 758 F.2d at 1575.

### III. ANALYSIS

### A. Validity of the 2009 Biological Opinion

The ESA requires that Defendants assess the effects of "any action authorized, funded, or carried out" by a federal agency, including themselves, to ensure that such action "is not likely to jeopardize the continued existence of any endangered species or threatened species . . . ."  16 U.S.C. § 1536(a)(2).  To "[j]eopardize the continued existence" means "to engage in an action that reasonably would be expected, directly or indirectly, to reduce appreciably the likelihood of both the survival and recovery of a listed species in the wild by reducing the reproduction, numbers, or distribution of that species."  50 C.F.R. §

402.02.  If Defendants determine that its action may adversely affect a listed species, it must engage in a formal consultation and after which it must provide a written statement, known as a biological opinion.  16 U.S.C. § 1536(b)(3)(A).

In its biological opinion, Defendants must include statements detailing its findings and "explaining how the proposed action will affect the species or its habitat."  Bennett v. Spear, 520 U.S. 154, 157-58 (1997) (citing 16 U.S.C. § 1536(b)(3)(A)).  This biological opinion must "[e]valuate the current status of the listed species," 50 C.F.R. § 402.14(g)(2), and "[e]valuate the effects of the action and cumulative effects on the listed species," 50 C.F.R. § 402.14(g)(3).  Lastly, this biological opinion must formulate whether the agency's "action, taken together with cumulative effects, is likely to jeopardize the continued existence of listed species . . . ."  Id. at § 402.14(g)(4); see also 16 U.S.C. § 1536 (b)(3)-(4).  However, while the cumulative effects of other agencies' actions must be taken into account to determine an environmental baseline, and that baseline must be used as a starting point for assessing the effect of the proposed action, "it is nevertheless only the impact of [the] proposed action which must be the subject of [Defendants'] ultimate jeopardy finding."  Defenders of Wildlife v. Norton, No. 99-927, 2003 WL 24122459 at *5 (D.D.C. Jan 7, 2003).

Plaintiffs' allege that because the 2009 BiOp does not comply with the ESA and these "fundamental statutory and regulatory requirements," Pls.' Mem.

Supp. Mot. Summ. J. 5, ECF No. 68-1, that the 2009 BiOp must be set aside as "arbitrary, capricious, an abuse of discretion or otherwise not in accordance with law," 5 U.S.C. § 706(2)(A).

## 1. No Jeopardy Analysis

Plaintiffs first allege that the 2009 BiOp is invalid because Defendants failed to analyze the total impact of the agency's action, that is the current action added to the other threats facing the loggerhead in light of the current status of the loggerhead.  Pls.' Mem. Supp. Mot. Summ. J. 5, ECF No. 68-1.  As stated above, the biological opinion must evaluate the effects of an action on a listed species.  50 C.F.R. § 402.14(g)(3).  The "[e]ffects of the action refers to the direct and indirect effects of an action on the species . . . that will be added to the environmental baseline."  50 C.F.R. § 402.02.  The Plaintiffs then point to the Ninth Circuit's explanation of a proper jeopardy analysis, alleging that the proper jeopardy analysis asks whether the additional harm from the action "will tip a species from a state of precarious survival into a state of likely extinction" or where the baseline already jeopardizes a species, whether the action will "deepen[] the jeopardy by causing additional harm."  Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv. ("NWF v. NMFS"), 524 F.3d 917, 930 (9th Cir. 2008).

However, as Defendants point out, the mere fact that the action causes additional harm does not, in itself, support a conclusion of jeopardy as "such an

interpretation conflicts with other provisions of the ESA that permit incidental take of a listed species." Pacific Coast Fed'n of Fishermans' Ass'ns v. Gutierrez, 606 F. Supp. 2d 1195, 1208 (E.D. Cal. 2008). Rather the ESA's allowance of incidental take statements recognizes that actions may incidentally take members of a listed species without resulting in jeopardy, see 16 U.S.C. §§ 1536(b)(4), 1539(a)(1)(B), (a)(2)(B)(iv); H.R. Rep. No. 97-567, at 26 (1982), reprinted in 1982 U.S.C.C.A.N. 2807, 2826-27, and that "[a]dverse effects may exist without constituting jeopardy," Endangered Species Act, 51 Fed. Reg. 19,926, 19,950 (June 3, 1986).

Regardless, Defendants must still abide by the jeopardy analysis requirements of Section 7(a)(2) of the ESA. Plaintiffs contend that Defendants compared the Fishery's relative contribution to other significant impacts on threatened sea turtles, e.g., AR Doc. 197 at 7384-86, and that such an approach has been consistently rejected as invalid under Section 7(a)(2) of the ESA, see, e.g., NWF v. NMFS, 524 F.3d at 929; Natural Res. Def. Council v. Kempthorne, 506 F. Supp. 2d 322, 375-76 (E.D. Cal. 2007). Plaintiffs again cite to the Ninth Circuit's interpretation of the ESA and the court's holding regarding a proper baseline analysis, finding that the "proper baseline analysis is not the proportional share of responsibility the federal agency bears for the decline in the species, but what jeopardy might result from the agency's proposed actions in

the present and future human and natural contexts." NWF v. NMFS, 524 F.3d at 930 (internal citations omitted).  Plaintiffs allege that by merely comparing the effects of the agency's actions with the threats other species face, Defendants ignored the ESA requirement to consider the direct, additive effects of the agency's actions.

However, "the ESA does not prescribe how the jeopardy prong is to be determined," Gifford Pinchot Task Force v. U.S. Fish & Wildlife Serv., 378 F.3d 1059, 1067 (9th Cir. 2004), and Defendants' choice of analysis "is owed substantial deference," Id. at 1066.  As stated above, the Defendants only need a "reasonable basis" for its conclusion that agency's action will not result in jeopardy.  See Oceana, Inc. v. Evans, 384 F. Supp. 2d 203, 220 (D.D.C. 2005). Further, because the 2009 BiOp also contained many predictive judgments, "[s]uch judgments are entitled to particularly deferential review." Trout Unlimited v. Lohn, 559 F.3d 946, 959 (9th Cir. 2009).

In this case, Defendants did not rely solely on a comparative analysis but the comparison between the Fishery's incidental take and overall mortality from other threats was but one factor in its analysis.  AR Doc. 197 at 7385-86. Instead, Defendants found that the loggerhead retained its potential for recovery despite the additional incidental takes that come from operation of the Fishery. AR Doc. 197 at 7388 (finding that Fishery's takes, when added to total mortality,

has only a "small effect" that is not believed to be "appreciable").  This conclusion

was the result of incorporating the actual baseline conditions surrounding the

loggerhead turtle population into Defendants' analysis.  AR Doc. 197 at 7299-

7310, 7313-24, 7381-84.  In fact, the 2009 BiOp, in framing the question of

jeopardy, asks:

> "whether the remaining takes are too much, given the current
> status of the species and predicted population trajectories.  Even
> though the proposed action includes a significant reduction in the
> reef fish fishery's impacts on loggerhead turtles, we must evaluate
> whether the remaining effects of the fishery, proposed to continue
> into the future and considered in the context of the environmental
> baseline and cumulative effects, are expected to appreciably
> reduce the likelihood of both the survival and the recovery of
> loggerhead turtles in the wild."

AR Doc. 197 at 7384.  Since the effects of the Fishery were evaluated "within the

context of other existing human activities that impact the listed species,"

Defendants' methodology was proper and deserves deference.  See NWF v.

NMFS, 524 F.3d at 930; Oceana, 384 F. Supp. 2d at 220-21.

Although Plaintiffs also allege that Defendants failed to account for the

declining population of the loggerhead, the 2009 BiOp concluded that despite a

decline in the loggerhead population, the loggerhead population is expected to

remain large for the next several decades.  AR Doc. 197 at 7388.  The 2009

BiOp then reasons that, due to this large population and despite any decline, the

operation of the Fishery will not appreciably affect the loggerhead turtles'
persistence into the future.  AR Doc. 197 at 7389-90.

Because the APA requires this Court to make a finding that an agency's
action, findings or conclusions are "arbitrary" or "capricious" before overturning
them as invalid, if there is any rational connection between the conclusion the
agency made and the facts the agency had before it, then this Court must defer
to the agency's expertise.  See Tackitt, 758 F.2d at 1575.  Although the Plaintiffs
attempt to discredit Defendants' methodology, Defendants have shown that they
meet the requirements of the Ninth Circuit's test as the 2009 BiOp concludes
that the additional mortality from the Fishery is not appreciable and thus would
not tip the loggerhead sea turtle into a state of likely extinction.  See AR. Doc. at
7388.  Further, there is no one definitive test as to how to determine jeopardy
pursuant to Section 7(a)(2) of the ESA.  See Gifford, 378 F.3d at 1067; 16
U.S.C. § 1536(b)(3)(A).  As long as the agency does not contradict the terms of
the ESA and presents a conclusion rationally connected to the facts before it,
then this Court is bound to accept that conclusion.  Tackitt, 758 F.2d at 1575.
Accordingly, because the facts before Defendants, the conclusion formulated on
those facts, and the method used by Defendants in reaching that conclusion are
rationally connected, this Court must afford them deference – the 2009 BiOp is
thus valid.

### 2. Best Available Science

In conducting its jeopardy assessment, Defendants must use the "best scientific and commercial data available."  16 U.S.C. § 1536(a)(2).  "The general view is that the agency decides which data and studies are the 'best available' because that decision is itself a scientific determination deserving deference." Miccosukee, 566 F.3d at 1265 (citing Marsh v. Or. Natural Res. Council, 490 U.S. 360, 377-78 (1989)).  However, this requirement does not allow an agency to "ignore available biological information . . . ."  Conner v. Burford, 848 F.2d 1441, 1454 (9th Cir. 1988).  In fact, the best available data requirement "prohibits the [Defendants] from disregarding available scientific evidence that is in some way better than the evidence [they] rel[y] on."  American Wildlands v. Kempthorne, 530 F.3d 991, 998 (D.C. Cir. 2008) (internal citations omitted). Failure to use the best available scientific and commercial data available would be a violation of Section 7(a)(2) of the ESA and "arbitrary and capricious" under the APA.  See 5 U.S.C. § 706(2)(A).  As stated earlier, if an agency "fails to examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made," then the agency action "must be reversed as arbitrary and capricious . . . ." Martin, 168 F.3d at 5 (internal citations omitted).

Plaintiffs first allege that Defendants failed to analyze the impact of the forced submergence of sea turtles that are caught on bottom longline gear in Defendants' calculation of a post-release mortality rate.  Pls.' Mem. Supp. Mot. Summ. J. 13, ECF No. 68-1.  Plaintiffs allege that although the effects of forced submergence were acknowledged by Defendants, see AR Doc. 197 at 7331-32; AR Doc. 197 at 7275-76; AR Doc. 1 at 59-61, these effects were not included in calculating the likely death rate of sea turtles caught in bottom longline gear. Pls.' Mem. Supp. Mot. Summ. J. 13, ECF No. 68-1.

Defendants used a post-release mortality rate – the percentage of sea turtles released alive that ultimately die from injuries due to capture by the Fishery – of 30%.  AR Doc. 197 at 7343-44.  In determining this 30% estimate, Plaintiffs allege that Defendants considered only those injuries which came as a result of pelagic longline gear.  AR Doc. 197 at 7343-45 & tbl. 5.1.  According to Plaintiffs, since pelagic longline gear is deployed closer to the surface, it does not pose as great a threat of forced submergence as bottom longline gear.  Pls.' Mem. Supp. Mot. Summ. J. 14, ECF No. 68-1.  However, Defendants allege that the 30% estimate is based on a 2006 report (the Ryder report) analyzing the results of a workshop of seventeen experts analyzing "Longline Post-Interaction Mortality," AR Doc. 197 at 7344; AR Doc. 261, and which accounts for sea turtle

mortality post-release from all longline gear, not merely pelagic longline gear, AR
Doc. 261 at 10390.

However, there is some confusion in the administrative record, as the
Ryder report, which itself does not indicate that it is limited to only pelagic
longline gear, when referenced in the 2009 BiOp, is characterized as dealing
with only pelagic longline gear.  AR Doc. 197 at 7343-45.  The 2009 BiOp further
states, in referring to the Ryder report, that Defendants convened a workshop in
2004 "to develop criteria for estimating post-release mortality of sea turtles
subject to pelagic longline fishery interactions" and continues on to state that "[i]n
2006, those criteria were revised and finalized."  AR Doc. 197 at 7343 (citing AR
Doc. 261 (Ryder report)).  Moreover, the table that Defendants cite to in the 2006
Ryder report to support the proposition that all longline gear were considered in
its post-release mortality rate is entitled differently in the Ryder report than it is in
the 2009 BiOp.  Compare AR Doc. 197 at 7345 & tbl. 5.1 (adding the word
"pelagic" to title of table found in Ryder report), with AR Doc. 261 at 10,390
(entitled "Criteria for assessing marine turtle post-interaction mortality after
release from longline gear").

However, despite this confusion, Plaintiffs have still failed to show that
Defendants did not use the best available scientific and commercial data in
completing its post-release mortality rate.  Because the best available data

requirement "merely prohibits the [Defendants] from disregarding available scientific evidence that is in some way better than the evidence [it] relies on," American Wildlands, 530 F.3d at 998 (internal citations omitted), Plaintiffs must show that Defendants ignored relevant biological data on forced submergence. Plaintiffs do not make any allegation that Defendants failed to use some available scientific data concerning the effect of forced submergence on the loggerhead sea turtle.  This Court then must defer to Defendants forced submergence analysis and its calculation of the post-interaction mortality rate.

Plaintiffs next allege that Defendants failed to use the best available scientific and commercial data by ignoring sub-lethal effects on sea turtles' ability to feed, reproduce and avoid threats. Pls.' Opp'n Defs.' Mot. Summ. J. 10, ECF No. 84.  However, this allegation is without much support or merit.  Defendants recognized that "sublethal effects may outweigh lethal effects due to impacts at the population level," AR Doc. 261 at 10376, and that "sea turtles released alive from bottom longline gear will have experienced a physiological injury from forced submergence and/or traumatic injury from hooking and entanglement," AR Doc. 197 at 7343.  To account for these sublethal effects, Defendants applied the 30% post-release mortality rate from forced submergence to all components of the Fishery, including the vertical-line commercial and recreational fisheries, even though Defendants found that "[f]orcible

submergence is extremely unlikely to occur" in those components.   AR Doc. 197 at 7360, 7370-71.  Defendants were faced with high uncertainty in calculating sublethal effects and great difficulty in quantifying such effects and chose a conservative application of its post-release mortality rate across all areas of the Fishery.  See AR Doc. 261 at 10376, 10385.  Therefore, because Defendants' choice of methodology was based on the best scientific and commercial data that was available – even if uncertain – it is entitled to deference.  See Miccosukee, 566 F.3d at 1265-66.

Plaintiffs also allege that Defendants failed to rely on the best available scientific and commercial data by failing to incorporate satellite tracking data in its determination of the year-round presence of loggerhead turtles.  Pls.' Mem. Supp. Mot. Summ. J. 15, ECF No. 68-1.  The result of this exclusion, Plaintiffs allege, is that Defendants incorrectly assumed that fewer loggerheads would be injured and killed outside the months of June through August.  Id. at 16. Plaintiffs allege that this result has no reasonable basis when viewed in light of the excluded satellite data and Defendants' conclusion is thus arbitrary and capricious pursuant to the APA.  Id.

However, Defendants decided that the best available data was not the satellite tracking data, but recent observer data which allowed Defendants to calculate bycatch rates rather than mere presence of the loggerhead turtle.  AR

Doc. 65 at 2721-23; AR Doc. 197 at 7346-47, 7366; AR Doc. 230 at 8075.

Defendants' analysis of the impact of Amendment 31 was based on the density

of sea turtles, not merely the presence of sea turtles.  AR Doc. 65 at 2686-87;

AR Doc. 118 at 4457-60; AR Doc. 197 at 7348-49; AR Doc. 230 at 8075; AR

Doc. 262 at 10406.  Defendants acknowledged the value of the satellite tracking

data, AR Docs. 187-188; AR Doc. 187 at 7165; AR Doc. 188 at 7167; AR Doc.

190 at 7189, and even requested follow up information after receiving it, AR

Docs. 187-88.  However, because the aerial survey data demonstrated that

"turtle density declines with increasing water depths," Defendants concluded that

it was the more appropriate data.  AR Doc. 107 at 3925-26.  Since the decision

as to which data is the "best available" is entitled to deference, Miccosukee, 566

F.3d at 1265, this Court must afford the Defendants deference in the choice of

the aerial survey data.

The best available data requirement only "prohibits the [Defendants] from

disregarding available scientific evidence that is in some way better than the

evidence [they] rel[y] on." American Wildlands 530 F.3d at 998 (internal citations

omitted).  Since the satellite tracking data does not contradict the aerial survey

data, this Court cannot find that Defendants disregarded data that is in some

way better than the data they relied on.  Therefore, this Court does not find that

Defendants' actions, with regard to the satellite tracking data, are arbitrary and capricious pursuant to the APA.

## B. Validity of the Continued Operation of the Fishery

### 1. Validity of Reinitiation Decision

As stated earlier, the ESA requires that Defendants assess the effects of "any action authorized, funded, or carried out" by a federal agency, including themselves, to ensure that such action "is not likely to jeopardize the continued existence of any endangered species or threatened species . . . ."  16 U.S.C. § 1536(a)(2).  However, this duty does not end with the completion of a biological opinion, but the agency remains under a continuing duty and must reinitiate consultation when "new information reveals effects of the action that may affect listed species or critical habitat in a manner or to an extent not previously considered . . . ."  50 C.F.R. § 402.16(b).  However, not every piece of new information requires Defendants to reinitiate consultation.  The ESA requires reinitiation only when the effects of the action "are different or more extensive" than those analyzed in the biological opinion.  Loggerhead Turtle v. Volusia County, 120 F. Supp. 2d 1005, 1025 (M.D. Fla. 2000).  With regard to the standard necessary for reinitiation, "[t]he burden, of course, is on the Plaintiff[s] to make a showing that the [agency] acted arbitrarily and capriciously in failing to

reinitiate consultation . . . ."  <u>Miccosukee Tribe of Indians of Fla. v. United States</u>,

420 F. Supp. 2d 1324, 1337 (S.D. Fla. 2006).

Plaintiffs allege that Defendants violated these implementing regulations

of the ESA by failing to reinitiate consultation following the 2010 Deepwater

Horizon oil spill.  Pls.' Mem. Supp. Mot. Summ. J. 19, ECF No. 68-1.  When the

Deepwater Horizon rig exploded in 2010, it poured an estimated 4.9 million

barrels of oil into the Gulf of Mexico over the course of 86 days.  RD AR Doc. 2

at 75.[2]  Defendants admit that the oil spill was an "unprecedented" event which

has "resulted in adverse effects on [ESA] listed sea turtles."  <u>Id.</u>  However,

Defendants did not reinitiate consultation on the basis that the "overall, long-term

environmental impacts of the Deepwater Horizon MC252 oil spill remain largely

unknown . . . ."  <u>Id.</u> at 81.

The language of 50 C.F.R. § 402.16(b) is quite clear: if there is

information showing the that Fishery's operation after the oil spill <u>may affect</u> the

loggerhead to an extent or in a manner not previously considered, then

Defendants are bound to reinitiate consultation.  50 C.F.R. § 402.16(b)

(emphasis added).  Defendants would have this Court re-interpret this language

to require reinitiation only when there is "new information <u>showing</u> that the status

of one or more listed species has changed to the extent that the reef fish fishery

---

[2] Citations to the Administrative Record dealing with Defendants' Reinitiation Decision (dated Nov. 4, 2010) will be to: RD AR Doc. # at page

is having greater adverse effects on the listed species than analyzed" in the 2009 BiOp.  RD AR Doc. 2 at 76 (emphasis added).  However, such an interpretation is inconsistent with the plain language of the statute.

Defendants' allegation that there is no need to reinitiate consultation until new information demonstratively shows that the Fishery has had a greater impact on loggerhead sea turtles than previously considered, see id. at 79, renders meaningless the ESA's use of the words "may effect," see 50 C.F.R. § 402.16(b).  Since Defendants' interpretation of 50 C.F.R. § 402.16(b) is clearly inconsistent with the statutory language, this Court gives that interpretation no deference.  Vidiksis v. EPA, 612 F.3d 1150, 1154 (11th Cir. 2010) (agency's "interpretation of its own regulations is 'controlling unless plainly erroneous or inconsistent with the regulation'") (quoting Sierra Club v. Johnson, 436 F.3d 1269, 1274 (11th Cir. 2006)).

Defendants admit that "oil spills of the magnitude of the Deepwater Horizon MC252 spill were not considered" in the 2009 BiOp, RD AR Doc. 2 at 75-76, and therefore, Defendants' failure to reinitiate consultation violated Defendants' continuing duty to assess jeopardy under the implementing regulations of the ESA.  This Court finds this as arbitrary and capricious pursuant to the APA.  Accordingly, Defendants' decision to not reinitiate consultation is invalid.

## 2. NEPA Violation

### *Validity of "No-Action" Alternative*

NEPA requires an agency to "[r]igorously explore and objectively evaluate all reasonable alternatives" to a proposed action through an Environmental Impact Statement (EIS).  40 C.F.R. § 1502.14(a).  This evaluation of alternatives "is the heart of the environmental impact statement."  Id. at § 1502.14.  As part of its analysis, the EIS must include "the alternative of no action," Id. at § 1502.14(d), which is "meant to provide a baseline against which the action alternative[] . . . is evaluated," Ctr. for Bio. Diversity v. U.S. Dep't of the Interior, 623 F.3d 633, 642 (9th Cir. 2010) (internal citations omitted).

Plaintiffs allege that Defendants violated NEPA by failing to use the proper no action alternative when preparing its EIS.  Pls.' Mem. Supp. Mot. Summ. J. 24, ECF No. 68-1.  Defendants identified the Fishery's operation prior to the April 2009 issuance of an emergency rule as the proper no action alternative.  AR Doc. 232 at 8192-94, 8216.  Plaintiffs, however, allege that the correct no action alternative was the Fishery's operation under the interim ESA Rule that was in effect prior to the passage of Amendment 31.  Pls.' Mem. Supp. Mot. Summ. J. 24, ECF No. 68-1; see AR Doc. 214.  In reviewing Defendants' choice of a no action alternative, this Court is governed by the arbitrary and capricious standard as set forth in § 706(2)(A) of the APA.  N. Buckhead Civic Ass'n v. Skinner, 903

F.2d 1533, 1538 (11th Cir. 1990).  Therefore, "when reviewing agency action in NEPA cases; if the agency action was not arbitrary or capricious, it should not be set aside."  Id.

It is clear that Defendants' identification of the Fishery's operation prior to the issuance of the emergency rule as the no action alternative was improper. Such an operation was in violation of law, specifically the ESA, see AR Doc. 214 at 7644 (discussing that expiration of the emergency rule in October of 2009 will allow fishery to operate in manner prior to emergency rule and that such an operation "would not be in compliance with the ESA"), and cannot be appropriately considered as the no action alternative for the EIS.  See Kilroy v. Ruckelshaus, 738 F.2d 1448, 1453-54 (9th Cir. 1984) (finding that use of policy that was legally barred was an inappropriate no action alternative); Friends of Yosemite Valley v. Kempthorne, 520 F.3d 1024, 1037-38 (9th Cir. 2008). Because Defendants chose a no action alternative that was legally invalid, Defendants are not entitled to deference.  See 5 U.S.C. § 706(2)(A) (court must "hold unlawful and set aside agency action, findings, and conclusions found to be . . . not in accordance with law").

Moreover, the no action alternative is the action "currently in use" or the "current level of activity."  Miccosukee Tribe of Indians of Fla. v. United States, 509 F. Supp. 2d 1288, 1293 (S.D. Fla. 2007).  Thus, Defendants' use of the pre-

emergency rule operation of the Fishery is also arbitrary and capricious as it was not the action that was "currently in use."  In discussing its options upon the expiration of the emergency rule, Defendants considered two alternatives: (1) to extend the emergency rule past the October 2009 expiration date; or (2) to pass the ESA Rule.  <u>See</u> AR Doc. 214 at 7644.  Defendants' clear intent to abandon the pre-emergency operation of the Fishery reveals that Defendants did not consider it a viable option and further bolsters the fact that it was not the action "currently in use."  <u>See</u> <u>Miccosukee</u>, 509 F. Supp. 2d at 1293.

Further, Defendants' argument that the ESA Rule is not a proper no-action alternative because it is an interim rule is misplaced.  Although the ESA rule was set to expire upon the passage of Amendment 31 and only intended as an interim measure, if Amendment 31 had not passed, then the ESA Rule would still be the governing authority of the Fishery.  In fact, the only valid action that can be clearly identified as the action "currently in use" is the ESA Rule.  Because of Defendants' failure to evaluate the ESA Rule as the "baseline against which the action alternative[] . . . is evaluated," <u>Ctr. for Bio. Diversity</u>, 623 F.3d at 642 (internal citations omitted), Defendants violated the "hard look" requirement of NEPA.  <u>Sierra Club v. U.S. Army Corps of Eng'rs</u>, 295 F.3d 1209, 1216 (11th Cir. 2002) (finding that court's "duty is to ensure that the agency took

a 'hard look' at the environmental consequences of proposed action") (citing

Skinner, 903 F.2d at 1541).

### Need for Supplemental EIS

In addition to an initial EIS, NEPA regulations also require that an agency

must "prepare supplements to either draft or final environmental impacts

statements if . . . [t]here are significant new circumstances or information

relevant to environmental concerns and bearing on the proposed action or its

impacts."  40 C.F.R. § 1502.9(c)(1)(ii).  However, this requirement for a

supplemental EIS only extends to proposed federal actions.  Id. at §§ 1502.5,

1502.9(c)(1)(ii).  Once an agency completes an EIS for a proposed action, then

supplementation of that EIS is required "only if there remains major Federal

action to occur . . . ."  Norton v. Southern Utah Wilderness Alliance ("SUWA"),

542 U.S. 55, 73 (2004) (internal citations omitted); see also 40 C.F.R. § 1508.18.

Further, in contrast to the ESA, NEPA imposes a procedural, not a substantive,

statutory requirement.  See National Ass'n of Home Builders v. Defenders of

Wildlife, 551 U.S. 644, 667 (2007).

The inquiry into whether Defendants were required to prepare a

supplemental EIS is three-fold: (1) whether any major federal action remained to

occur; (2) whether there are significant new circumstances or information; and

(3) whether the new information or circumstances are significant enough to the

major federal action as to require supplementation of the EIS.  See Marsh, 490

U.S. at 374.

      In determining whether a supplemental EIS was necessary, this Court

must first decide, as a threshold inquiry, whether there is any ongoing major

federal action which would require supplementation.  See SUWA, 542 U.S. at

72-73 (referencing the major federal action requirement and finding that "[b]efore

addressing whether a NEPA-required duty is actionable under the APA, we must

decide whether NEPA creates an obligation in the first place").  Plaintiffs allege

that the ongoing major federal action is the operation of the Fishery as a whole

under the FMP and the correlating site specific action, not merely the approval of

Amendment 31 to the FMP.  Pls.' Opp'n Defs.' Mot. Summ. J. 21-22, ECF No. 84.

Thus, according to Plaintiffs' allegations, due to the nature of Defendants'

Fishery operation, there is ongoing major federal action.  See Greenpeace v.

National Marine Fisheries Serv., 55 F. Supp. 2d 1248, 1257-58 (W.D. Wash.

1999) (finding that "Fishery Management Plans . . . constitute major federal

actions requiring an EIS"); Greenpeace Found. v. Daley, 122 F. Supp. 2d 1110,

1121 (D. Haw. 2000) (finding that "management of the Fishery pursuant to the

FMP qualifies as a major federal action"); cf. Greater Yellowstone Coal. v.

Tidwell, 572 F.3d 1115, 1123 (10th Cir. 2009) (finding no ongoing major federal

action after approval of permit because the agency was "largely uninvolved in the operations of the feedground").

However, at issue in this case, and the subject of the initial EIS, is not the FMP as a whole but the approval of Amendment 31 to the FMP.  See AR Doc. 232.  Defendants signed the ROD for Amendment 31 on March 29, 2010.  AR Doc. 230 at 8069-71.  "Once an EIS's analysis has been solidified in a ROD, an agency has taken final agency action . . . ."  Or. Natural Desert Ass'n v. Bureau of Land Mgmt., 625 F.3d 1092, 1118 (9th. Cir. 2010); see also SUWA, 542 U.S. at 73(holding that once a land use plan was approved, there is no ongoing major federal action that requires supplementation); Ouachita Watch League v. Jacobs, 463 F.3d 1163, 1173 (11th Cir. 2006) (holding it is "well settled that 'a final EIS or the record of decision issued thereon constitute[s] final agency action'") (quoting Sw. Williamson Cnty. Cmty. Ass'n, Inc. v. Slater, 173 F.3d 1033, 1036 (6th Cir. 1999)).  Therefore, because Defendants signed the ROD, constituting final agency action, prior to the Deepwater Horizon oil spill no agency action remained and no supplemental EIS was required.[3]  See Audubon Naturalist Soc'y v. U.S. Dep't of Transp., 524 F. Supp. 2d 642, 710-11 (D. Md. 2007) (finding no major federal action remaining after the approval of road project contracts even though two remaining contracts (comprising less than

---

[3] Because of the threshold finding that no major federal action remained, this Court will not go into the discussion of whether new information or circumstances were significant enough to require a supplemental EIS.

10% of project) had not yet been approved); <u>Buckeye Forest Council v. U.S.</u>

<u>Forest Serv.</u>, 378 F. Supp. 2d 835, 845 (S.D. Ohio 2005) (finding no major

federal action remaining after approval of forest plan).


## IV. ORDER

Based upon the foregoing reasons, it is hereby ORDERED and ADJUDGED

that:

1.    Plaintiffs' Motion for Summary Judgment is GRANTED as to the following:

      a.    Defendants violated the APA, MSA, and ESA in the decision not to

          reinitiate consultation.

      b.    Defendants violated the APA, MSA, and NEPA in the choice of the

          Fishery's operation prior to the April 2009 emergency rule as the no

          action alternative in the EIS to Amendment 31.

2.    Defendants' Cross-Motion for Summary Judgment is GRANTED as to the

      validity of the biological opinion.

3.    In all other respects, the Motions are DENIED.

4.    The injunctive relief Plaintiffs seek from this Court will be stayed until after

      supplemental briefing from the Parties concerning the appropriate scope

      of relief and remedy based on this Court's decision today.  The Parties

      shall have until August 1, 2011 to submit supplemental briefs on the issue

of relief.

DONE AND ORDERED this <u>fifth</u> day of July, 2011.

*s/ Stephan P. Mickle*

Stephan P. Mickle
Senior United States District Judge
